# THE COMMONWEALTH OF MASSACHUSETTS *vs.* THE BOSTON & MAINE RAILROAD.

County commissioners having awarded damages for land taken for a railroad, and the respondents having had their estimate revised by a jury, who also awarded damages, and the verdict of the jury having been accepted by the court of common pleas, it was held, on appeal to this court, that it was open to the respondents to insist that no damages could be legally assessed against them.

An act of the legislature, by which a railroad corporation was established in the usual manner, and with the ordinary powers and privileges of such corporations, authorized the corporation to locate their road, so that the same might pass over certain land, which belonged to and was held by the commonwealth as a body politic for a particular purpose, but without any expression in the act of a design, on the part of the legislature, to aid the corporation in their undertaking: It was held, that it was not the intention of the legislature, by such act, to grant the

land of the commonwealth, or any easement therein, to the corporation, without compensation; and that if such land of the commonwealth were taken by the corporation for their road, the commonwealth might institute proceedings, and prosecute a claim for damages, before the appropriate tribunal, in the same man-ner as an individual proprietor.

Where general rights are declared, or remedies given, by law, the commonwealth is included therein, though not named.

The attorney of the commonwealth for the county of Suffolk, after the act of 1843, *c.* 99, abolishing the office of attorney-general, and previous to that of 1849, *c.* 186 reëstablishing that office, was authorized by law, upon the requisition of the gov-ernor, to institute proceedings before the proper tribunal, for the recovery of dam-ages, sustained by the commonwealth for land taken for a railroad, and to prose-cute the same to their final termination; and such attorney had a right, also, with the permission of the court or tribunal in which the proceedings were pend-ing, and for sufficient cause, to avail himself of the aid of other suitable counsel, in conducting and managing the same, under his direction and control, and upon his responsibility.

An agreement having been made between the commonwealth and the Charlestown Branch Railroad Company, providing, amongst other things, that, upon certain terms and conditions therein mentioned, the commonwealth would authorize such corporation to institute proceedings, in the name of the commonwealth, against the Boston & Maine Railroad, for the purpose of recovering all claims which the commonwealth might have against the latter, for laying out and constructing their road over land of the commonwealth, the money receivable for such dam-ages to be paid to the treasurer of the commonwealth, and by him retained until the performance by the Charlestown Branch Railroad Company of the covenants contained in the said agreement, and on their part to be performed; and the com-monwealth having given such authority, and proceedings having been instituted accordingly in the name of the commonwealth, by the Charlestown Branch Rail-road Company against the Boston and Maine Railroad, for the recovery of such damages: It was held, that the contract was not illegal; that the case was one in which the commonwealth was a party and interested; and that the damages were not limited to the amount to which the commonwealth was entitled at the time of the making of the agreement, but were recoverable as of the time of the filing of the location of the railroad.

The same persons being summoned as jurors, to assess the damages severally sustained by two railroad corporations, for the taking of their lands lying con-tiguous to each other, by a third railroad corporation, for the road of the latter, it was held to be no objection to the competency of one of the jurors to sit as such in the cause first tried, that he was a stockholder in the other corporation peti-tioning, whose cause was to be tried immediately afterwards.

On a claim for damages for land taken for a railroad, the claimant may prove, by the testimony of the engineer who made the preliminary surveys and plans for such road, that the same might have been located, pursuant to the charter, in various modes which would not have required the taking of the land of such claimant.

The owner of flats crossed by a railroad bridge having raised the flats around and under the bridge, within the location of the road, but without the consent of the proprietors thereof, is entitled to recover by way of damages, against such propri-etors, for so much of the expense of such raising and filling up, as is necessary to enable him to enjoy his other lands; provided such necessity was caused by the location and construction of the railroad.

Where the owner of flats crossed by and taken for a railroad had previously caused

the same to be surrounded by a sea wall and filled up, it was held, that the expense of such filling up was proper evidence to be considered by the jury, in estimating the damages sustained by the owner for the land so taken.

On a trial before a sheriff's jury, summoned and empanelled to assess damages for land taken for a railroad, the sheriff cannot be called upon to instruct the jury as to the weight, effect, or sufficiency of the evidence.

In proceedings where the commonwealth is a party or interested, and no other special mode of summons is provided by law, notice to the governor, as the chief executive officer, would, it seems, be considered as sufficient.

Where the estimate of a petitioner's damages, occasioned by the construction of a railroad, as made by the county commissioners, is revised by a jury, on the application of the respondents, and the amount reduced; and the verdict of the jury, on an appeal from the adjudication of the court of common pleas accepting the same, is established by this court; neither party is liable to the other for the costs of the proceedings before the sheriff and jury, but the petitioner is entitled to recover against the respondents the taxable costs of the appeal.

If, on an appeal to this court from an adjudication of the court of common pleas, either accepting or setting aside (see *Parker* v. *B. & M. Railroad*, page 107.) the verdict of a sheriff's jury, the verdict of the jury is established, interest is to be computed on and added to the amount of the damages awarded by the jury, from the time when the verdict was returned into the court of common pleas, to the time of its affirmation by this court.

The judgment of this court, confirming the proceedings of a sheriff's jury, on an appeal from the adjudication of the court of common pleas, either accepting or setting aside the verdict, when the amount of the damages has been liquidated by computing and adding interest, and the costs have been taxed, is to be enforced by a certificate to the county commissioners, directing them to issue a warrant of distress for the amount so ascertained.

THE commonwealth of Massachusetts, on the 13th of November, 1800, became the purchasers of a lot of land in Charlestown, by a deed thereof of that date from Archibald M'Neil, in pursuance of a resolve of the general court, passed at the January session, 1800, for the purpose of obtaining a site for the erection of a state prison.

By this deed, M'Neil granted, sold and conveyed to the commonwealth a piece of land, particularly described therein containing four acres and a half and seven rods of upland, according to a plan thereof taken by Joseph Aiken, being the point of land purchased by the grantor of Mary Lynde, together with all the flats adjoining thereto, to which the grantor derived title by force of the deed from Mary Lynde to him, and also a free and uninterrupted right of an open way, for passing and repassing, in any manner, at any time, the full width of forty-five feet in a direct course between M'Neil's mansion house and his rope walk, from the public street in

Charlestown to the land and flats conveyed, with all other appurtenances to the premises belonging.

On the 9th of April, 1836, (by *St.* 1836, *c.* 187,) the Charlestown Branch Railroad Company was incorporated, with authority to construct a railroad from Swett's Wharf in Charlestown to a point on the Boston and Lowell Railroad, near the " one mile post," so called. According to the location specified in the act, one point in the direction of the road was "a point near the southerly corner of the land or wharf of the state prison ; " from whence the road was to be laid northwesterly by a straight line across the bay to the land of the M'Lean Asylum, and thence by a curve to its terminus in the Boston and Lowell Railroad.

By the act of incorporation, authority was given to the governor, with the advice and consent of the council, to sell, exchange or otherwise dispose of to the corporation, such part of the land and flats owned by the commonwealth, on the south-easterly and north-westerly sides of Austin Street and the Prison Point bridge in Charlestown, and lying without the walls and fences of the state prison, in such manner, and upon such terms, as they might deem for the interest of the commonwealth ; and also to make such arrangements with the corporation, concerning the building of their road, and the filling up of the flats in and upon the land of the commonwealth, as should be considered just and expedient. The same section also provided, that the road should not be made until the governor, with the advice and consent of the council, should have approved of the location and proposed mode of building that part of the road, which might be constructed over the land and flats of the commonwealth near the state prison.

The time limited in the act of incorporation for filing the location and completing the road, namely, the 1st of January, 1837, was subsequently extended by the act of March 25th, 1837, (*St.* 1837, *c.* 94,) to the 1st of January, 1839, for filing the location, and for completing the road until the 1st of January, 1840 ; and the road was laid out and completed accord-

ingly. By a subsequent statute passed March 17th, 1841, (*St.* 1841, *c.* 108,) the corporation were authorized to extend their road from its terminus in the Boston and Lowell Railroad in a westerly direction.

By an act passed on the 3d of March, 1842, (*St.* 1842, *c.* 84,) to establish the Fitchburg Railroad Company, that corporation were authorized to lay out and construct a railroad from a point on the Charlestown Branch Railroad to Fitchburg, and to make arrangements with the latter corporation, either by a purchase or lease of their road, for the use of the same, from the point thereon where the Fitchburg Railroad commenced to its termination in Charlestown. By a subsequent act, passed on the 7th of February, 1846, (*St.* 1846, *c.* 21,) the Fitchburg Railroad Company succeeded to the corporate powers, privileges, and duties of the Charlestown Branch Railroad Company, (the corporate existence of the latter being continued for three years longer for certain purposes,) and the road of the latter became a part of the Fitchburg Railroad.

On the 16th of March, 1844, by an act then passed, (*St.* 1844, *c.* 172,) a corporation was established by the name of the Boston and Maine Railroad Extension Company, (subsequently united with the Boston and Maine Railroad, under the latter name,) for the purpose of constructing a railroad from a point in the Boston and Maine Railroad in Wilmington, near its junction with the Boston and Lowell Railroad, to the public square at the easterly end of Haverhill and Canal Streets in Boston. A part of the route designated in the act was as follows: "crossing Mystic River by a bridge near Malden bridge ; thence passing near the Mill Pond at the outlet of the Middlesex Canal, at least one fourth of a mile from the M'Lean Asylum, by the way of Somerville or Charlestown, to a point on the Charlestown Branch Railroad, near their engine house in Charlestown ; provided it shall not cross the Charlestown Branch Railroad, at any point east of the state prison, without the assent of the directors of the Charlestown Branch Railroad Corporation ; thence crossing

3*

Charles River by a bridge, above Warren bridge, to the city of Boston, between Haverhill Street and Canal Street ; and thence between said streets to the public square, at the easterly end of said streets."

In the month of May following their act of incorporation, the Boston and Maine Railroad Extension Company laid out and commenced the construction of their road.   The route located, so far as it is material to be here stated, was from a point on the Back Bay, about three eighths of a mile east of the M'Lean Asylum, in Somerville, in a straight line south thirty and a half degrees east across the Back Bay, the Charlestown Branch Railroad, the Prison Point bridge, and Charles River, to the city of Boston.   In thus laying out their road, the corporation crossed over the flats belonging to the commonwealth, adjoining the grounds occupied by the state prison, and appropriated to their own use about fifty thousand feet of land.   The location was filed with the county commissioners of Middlesex, on the 12th of February, 1845.*

In pursuance of the provisions of the seventh section of the act incorporating the Charlestown Branch Railroad Company, an agreement was entered into by indenture, on the 15th of October, 1844, between the commonwealth, of the first part, and the Charlestown Branch Railroad Company, of the second part, relative to a sale by the commonwealth of a portion of the flats belonging to the latter near the state prison.

The indenture first recites, that the commonwealth are the owners of two certain tracts of land and flats situate in Charlestown, on the south-easterly and north-westerly sides of Austin Street and the Prison Point bridge, and lying without the walls and fences of the state prison, (which tracts are particularly described in the indenture, by reference to a plan drawn by S. M. Felton and George A. Parker, dated October 4th, 1844,) and that the Charlestown Branch Railroad Com-

---

* The principal localities referred to in this case may be seen on the map inserted at page 9.

pany purpose to enclose the said flats by a sea wall, and to fill up the same on reasonable terms of agreement with the commonwealth.

It is then agreed and covenanted, on the part of the corporation, amongst other things, that they shall construct, on a suitable and safe foundation, a good, permanent, and substantial sea wall, round the flats contained in the two tracts described in the recital, by an exterior line designated on the plan, the same to be built and raised above the highest tides; that they shall also fill up the flats enclosed within the sea wall of suitable materials, and make the same solid land; that, when the filling up shall have been completed, they will construct a good and sufficient board or stockade fence between the Boston and Maine Railroad and the Charlestown Branch Railroad, on the one side, and the second described tract of land or flats, on the other side; that they will construct the whole of the sea wall, and fill up the flats contained in the second described tract, and construct the fence, in a faithful and substantial manner, and complete the whole work in eighteen months from the date of the indenture, at their sole risk and expense, and without any charge to the commonwealth.

It is then agreed and covenanted, on the part of the commonwealth, that, whenever within the period of eighteen months and a day from the date of the indenture, the corporation shall have constructed the whole of the sea wall, and completed the filling up of the second described parcel of land and flats, and shall have built the fence, and shall have done the work in a thorough and proper manner, to the satisfaction of James F. Baldwin, esquire, the commonwealth shall then convey to the corporation, their successors and assigns, by a good and sufficient deed of quitclaim, all the right, title and interest of the commonwealth in and to the first described tract of land and flats, subject however to the rights of the proprietors of the two railroads, respectively, and of the Prison Point bridge.*

---

* A deed was made and executed accordingly, by the governor, on the 2d of October, 1846.

The indenture contained, also, with other stipulations and agreements on both sides, not material to the present case, the following clause : —.

" And said party of the first part hereby authorize said party of the second part to institute proceedings, in the name of said party of the first part, for the purpose of recovering all claims which said party of the first part may have against said Boston and Maine Railroad Extension Company, for damages for taking for their railroad a part of said flats embraced in said first described tract of land and flats, which proceedings shall be instituted and carried on at the sole risk and expense of said party of the second part, and when the amount of said damages shall be ascertained by the decision of the commissioners, or the verdict of a jury, or in any other manner agreed upon by both parties hereto, the said amount shall be paid to the state treasurer, and he shall keep the same as a separate fund, and when said party of the second part shall have performed their covenants, herein contained, the said treasurer shall pay over said fund to said party of the second part, for their sole use and benefit."

In December, 1845, the Charlestown Branch Railroad Company, by their president, addressed a petition to the governor, representing that they had nearly fulfilled, on their part, the agreement made between them and the commonwealth on the 15th of October, 1844, and were nearly ready to receive the deed stipulated to be given them in that agreement ; but, before receiving the same, the corporation were desirous of instituting proceedings immediately, in the name of the commonwealth, but at their own expense, against the Boston and Maine Railroad, (with which the Boston and Maine Railroad Extension Company had then been united,) " for the purpose of recovering all claims," which the commonwealth might have against that company, for damages occasioned by the taking for their railroad a part of the flats mentioned in the agreement between the petitioners and the commonwealth, according to the provisions of the same. The petitioners therefore prayed that the governor would forthwith direct the

commonwealth's attorney for the county of Suffolk to appear in the cause, and institute proceedings therein on behalf of the commonwealth.

This petition was referred to a committee of the council, who reported thereon, that, in their opinion, the petitioners could only proceed in a legal manner in the prosecution of their claims against the Boston and Maine Railroad, after the governor should have authorized the district attorney to institute proceedings in the name of the commonwealth ; and the committee therefore recommended, that the governor be advised to refer the petition to the district attorney for the county of Suffolk, and if, in his opinion, it was a proper case for the use of the name of the commonwealth, in ascertaining the rights of the parties under the contract, that the attorney be authorized and directed, at the expense and risk of the petitioners, to cause such proceedings to be instituted, as should lead to a decision of the rights of the parties either by arbitration or by the courts of law.

This report being accepted and the governor advised accordingly, on the 24th of December, 1845, a letter of that date was thereupon addressed by governor Briggs to Samuel D. Parker, esquire, commonwealth's attorney for the county of Suffolk, enclosing copies of the petition of the Charlestown Branch Railroad Company, and of the proceedings of the council thereon, and directing the attorney, if, on examination, he should be of opinion that proceedings ought to be instituted in the name of the commonwealth, for the benefit of the petitioners, to give such direction to the president of the company, as the case might require, taking care that the commonwealth should be saved harmless from any cost.

In pursuance of these directions, the commonwealth's attorney for the county of Suffolk, on the 2d of January, 1846, presented a petition in the name and on behalf of the commonwealth to the county commissioners of Middlesex, setting forth the interest of the commonwealth in the land and flats already alluded to ; that the proprietors of the Boston and Maine Railroad had located their road across the same, in such

a manner as disadvantageously to separate the premises, and greatly to injure and impair the value of the residue; and praying the commissioners, after due notice to the Boston and Maine Railroad, to view the premises and estimate the damages sustained by the petitioners by reason of the taking and appropriation of the same.

Upon this petition, due notice having first been given to the Boston and Maine Railroad, the commissioners had a meeting, at the Mansion House in Charlestown, on the 21st of May, 1846, when and where the corporation appeared by their counsel, and James Dana and George W. Warren, esquires, appeared for the commonwealth. The meeting was adjourned to the 25th instant, when the corporation appeared as before, and the commonwealth by Samuel D. Parker, esquire, attorney of the commonwealth for the county of Suffolk, at whose request, Messrs. Dana and Warren were permitted by the sheriff, in his stead, to represent the commonwealth. The commissioners, having viewed the premises and heard the parties, estimated the damages sustained by the commonwealth, by the location and construction of the respondents' railroad, as alleged in the petition, at the sum of thirty thousand and five dollars, and ordered the respondents to pay that sum to the commonwealth, with costs to be taxed by the commissioners.

The respondents, being dissatisfied with this estimate of damages, presented their petition to the county commissioners, at the same session, praying that a jury might be summoned to determine the matter, and, if they should see cause, to assess damages for the claim of the commonwealth as set forth in their petition. On this petition, the commissioners passed an order, dated July 3d, 1846, that the clerk issue a warrant directed to the sheriff of the county, to summon a jury for the purpose mentioned in the petition, at such time as the petitioners might call for it. The petitioners made their request to the clerk, on the 3d of October, 1846, and the clerk thereupon issued the warrant for a jury in the usual form.

At the meeting of the commissioners in September, 1846, it was agreed by the parties, that the verdicts in the case of the commonwealth against these respondents, and in the case of James Gould and the Fitchburg Railroad Company, against the same respondents, pending at the same time, might be returned, whenever prepared, as of the September term of the court of common pleas then in session, and the suits carried up on exceptions to this court, so as to be heard as of the October term, 1846; that no objections should be made on account of the jury's not having been summoned within three months from July 3d, the date of the order, or on account of the date of the verdict being after the sitting of the court; and that the jury should be called out in or before the first week in November. This agreement was signed by the counsel and filed with the commissioners.

The sheriff proceeded to the execution of the warrant, and made application to the selectmen of Charlestown and Somerville, and to the mayor and aldermen of Cambridge, " the three nearest towns not interested in the question," (as stated in the sheriff's return,) to draw and return jurors, namely, Charlestown, five, Somerville, four, and Cambridge, five, for the purpose of estimating the petitioners' damages. Jurors being returned accordingly, the sheriff summoned them to attend him at the Mansion House, in Charlestown, on the 2d of November, 1846, and also gave notice to the parties of the time and place of their meeting, for the purposes expressed in the warrant.

The jurors attended at the time and place appointed, and one of them being excused, at his own request, and for reasons offered by him, the names of the others were arranged in alphabetical order, and the first twelve were called and sworn to make a just and true appraisement of the damages sustained by the petitioners, and well and truly to try all such other matters as should lawfully be submitted to them under the complaint, and to give a true verdict therein according to law and the evidence given them.

The jury, having chosen a foreman, by ballot, were **first**

taken to view the premises; and the sheriff then adjourned to the town hall in Charlestown, for the purpose of hearing the parties and their evidence. The hearing occupied the second, third, and fourth days of November; and when the parties had been fully heard, the jury agreed upon their verdict, which was sealed up and returned with the warrant and the sheriff.'s proceedings under it to the court of common pleas. The jury estimated the petitioners' damages, at the sum of twenty-nine thousand seven hundred dollars, and returned a verdict accordingly, which being accepted by the court of common pleas, the respondents thereupon appealed to this court.

In the course of the proceedings before the jury, certain rulings were made and instructions given by the sheriff, which being objected to by the respondents, a statement thereof and of the evidence relating to the same was made by the sheriff in his return. These rulings and instructions, which were the subjects of inquiry in this court, were as follows : —

1. At the time appointed for empanelling the jury, Sidney Bartlett, James Dana, and George W. Warren, esquires, appeared, as they stated, at the request of Samuel D. Parker, commonwealth's attorney for the county of Suffolk, to prosecute the claim of the commonwealth before the jury. The respondents denied the right of these gentlemen so to appear, and they thereupon produced and exhibited to the sheriff the letter of the governor, already stated, with the copies enclosed addressed to the attorney for Suffolk, directing him to institute proceedings; and Mr. Parker, being present, produced and exhibited a letter from himself to Messrs. Bartlett, Warren, and Dana, in which he stated that his engagements in the municipal court in Boston were such, that he found it impossible to attend before the sheriff and jury, in the case of the commonwealth against the Boston and Maine Railroad, and authorizing and requesting them to appear and act in his behalf in conducting the same. The sheriff thereupon ruled, that Messrs. Bartlett, Warren and Dana were duly authorized to appear and prosecute the petition, as counsel for the commonwealth.

2. Before the jury were empanelled, the respondents desired that the persons summoned and in attendance as jurors should be asked if they were any of them stockholders in the Fitchburg or Charlestown Branch Railroads. The question being put, John Fosdick, returned as a juror from Charlestown, answered that he owned stock in the Fitchburg Railroad. The respondents thereupon objected to the competency of Fosdick to serve as a juror, on the ground, that the case of the petition of the Fitchburg Railroad Corporation, for the recovery of damages, against the same respondents, was to be tried immediately after this; that the two cases related to adjoining pieces of flats ; that the persons summoned as jurors were the same in both cases ; that a verdict fixing the value of the land in the first case would have an important influence upon the estimation of damages in the second ; and that it was for the interest of the juror, as a stockholder in the Fitchburg Railroad, to have the land of the Charlestown Branch Railroad Company appraised at a high rate. The sheriff ruled, that it was proper, on the motion of either party, to put to any of the jurors summoned the questions prescribed by the Rev. Sts. *c.* 95, § 27. The counsel for the petitioners then moved, that these questions should be put to Fosdick ; and having been so put and answered in the negative, under oath, the sheriff ruled that the juror was competent, and he was accordingly sworn and sat on the trial.

3. In the course of the trial, the petitioners offered the testimony of Samuel M. Felton, an engineer, who was employed to make the preliminary surveys and plans for the extension of the Boston and Maine Railroad, in order to show that the road might have been located, pursuant to the charter, in various modes which would not have crossed any of the lands of the commonwealth. The respondents objected to the testimony, except as to the fact that the witness was employed to make the surveys. But the sheriff ruled otherwise, and admitted the evidence.

The witness then testified, that he was employed by the persons, who were afterwards incorporated as the Boston and

Maine Railroad Extension Company, to make the preliminary surveys, which were presented to the legislature with their petition for a charter ; that his plans showed two routes, one coming east of the prison, and the other west of the prison and entering upon the long bridge of the Charlestown Branch Railroad ; that neither of these routes touched the state prison property of the commonwealth, as shown on his plans ; that he had since examined the premises, and ascertained that his western route could have been so modified as to keep a quarter of a mile distant from the buildings of the M'Lean Asylum, and not touch the flats of the state prison ; that the present line of the Boston and Maine Railroad is not a quarter of a mile distant from the lands of the M'Lean Asylum ; that the original location of the Charlestown Branch Railroad through these flats was forty feet wide, which is wide enough for more than three railroad tracks ; and that the present route of the Boston and Maine Railroad is a better line, as a railroad line, without regard to expense.

4. It having been shown in evidence, on the part of the petitioners, that the Charlestown Branch Railroad Company, subsequent to the 15th of October, 1844, had raised the flats under and around the respondents' bridge, passing over the premises and within their location, without proving any consent therefor, the respondents requested the sheriff to instruct the jury, that the petitioners were not entitled to recover the cost of such filling up.

The sheriff declined to give the instruction prayed for, but instructed the jury, that the petitioners were entitled to such sum for raising the flats under and around the respondents' bridge, passing over the premises and within the location of the respondents' road, as the jury should find was incurred from necessity, in order to enable the commonwealth to enjoy their other lands ; provided the jury should believe that such necessity was created by reason of the location and construction of the respondents' road.

5. In reference to the filling up of the flats, by the Charlestown Branch Railroad Corporation, in execution of the agree-

ment entered into between them and the commonwealth, on the 15th of October, 1844, some of the principal terms of which have been already stated, the petitioners called as a witness George A. Parker, who testified, that he had been engaged as a railroad engineer and surveyor for eleven years ; that he superintended the filling up of the flats by the Charlestown Branch Railroad Company, the average cost of which, including the sea wall, superintendence, &c., was twenty cents a superficial foot; that the bridge of the respondents over the prison flats was built in October, 1844, on spruce piles, which were raised three and a half feet above high water; that the other bridges of the respondents, which were built over the channels and tide waters, were built upon oak piles ; that from the different manner of building their bridge over the prison flats, and from their locating their road through the flats five rods wide, he inferred that the bridge over these flats was a temporary structure, and that the respondents contemplated filling up these flats.

The same witness, being called by the respondents, testified, that the cost to the Charlestown Branch Railroad Company, of filling up that portion of the state prison flats retained by the commonwealth, including their portion of the exterior wall, was but sixteen and a half cents a superficial foot ; and that the whole expense of fulfilling their contract with the commonwealth, sc far as respected the portion of flats retained by the commonwealth, was $12,742·12.

The respondents thereupon requested the sheriff to instruct the jury, that the agreement of October 15th, 1844, between the commonwealth and the Charlestown Branch Railroad Company, and the testimony of Parker as to the cost of the work of making the land for the commonwealth, afforded a measure of the value of the land taken, and of the damages done to the residue, and also a measure of the damages sustained by the acts of the respondents, which the jury were bound to apply accordingly in their assessment of the damages. The sheriff declined so to instruct the jury, but instructed them, that the contract and testimony above stated

afforded proper evidence of the damages sustained by the acts of the respondents, which the jury were to consider and weigh.

6. In order to prove their title to the premises in question, under the deed of M'Neil, already stated, which was in evidence, the petitioners introduced amongst others three witnesses : —

George Farrar, who testified that certain plans and explanations, which were put into the case as those referred to in M'Neil's deed, were exact copies of the plans and explanations, which he found in the office of the secretary of the commonwealth, filed with the deed of M'Neil ; — Alexander Wadsworth, who testified that the plan put into the case as his plan was made by him from an actual survey, and that the lines of high and low water and of the channels were accurately described thereon ; — and Nathaniel Austin, who testified that he recollected the premises upon which the state prison was built since the year 1783 ; that the same were well known to him as a place called Lynde's Point ; that the copy of the plan exhibited by Farrar was a correct view of the point when he first knew it ; and that the channel and low water mark were correctly described on Wadsworth's plan.

The respondents requested the sheriff to instruct the jury, that this evidence was not sufficient to prove the title of the petitioners to the flats in question, because the petitioners had not shown that the flats were appurtenant to the upland described in M'Neil's deed to the commonwealth. The sheriff declined to instruct the jury as thus requested.

7. The respondents requested the sheriff to instruct the jury, that the Charlestown Branch Railroad Company, prosecuting this claim for damages against the respondents, under the agreement of October 15th, 1844, could recover no damages beyond what the commonwealth were entitled to at that time. The sheriff declined to give such instruction, but instructed them, that the petitioners were entitled to recover damages as of the time of the filing of the location of the respondents' railroad.

8. After the evidence had been given on both sides, the respondents requested the sheriff to rule and instruct the jury thereon, that the commonwealth could not be a party complainant under the Rev. Sts. *c.* 39 ; that the commonwealth had no right to claim the damages set forth in their petition, in this or in any other form ; and that the petition was presented by and for the benefit of the Charlestown Branch Railroad Company, under an illegal contract. But the sheriff declined to give the instructions so requested.

*B. R. Curtis* and *T. Farrar*, for the respondents.

*S. Bartlett* and *G. W. Warren*, for the petitioners.

The opinion of the court was delivered on the 26th of March, 1849.

SHAW, C. J.* This case comes before us by the way of appeal from an adjudication of the court of common pleas, accepting and affirming the verdict of a sheriff's jury, awarding damages to the commonwealth, for land taken by the respondents for the construction of their railroad.

In regard to what questions are open upon such an appeal, we refer to the cases of Walker and the Fitchburg Railroad Company against these respondents, which have been argued at the present sittings, and in which opinions are given at the same time with this.

Upon the great question argued in this case, namely, whether the commonwealth can claim any damages against the respondents, under their act of incorporation, it was contended by the petitioners, that the question was not open upon this appeal, and that upon the petition of the respondents for a jury to assess the damages, it was too late for them to insist, that no damages could be assessed. But whether the commonwealth can claim damages or not, it appears to us, is a question of law. If no damage can be claimed, this is a good reason why the court of common pleas should have set aside a verdict assessing damages ; and if they have accepted a verdict, which ought to have been rejected, such acceptance

---

* WILDE, J., and FLETCHER, J., did not sit in this cause.

4 *

is an error in a matter of law apparent upon the record, and, of course, open for revision here on appeal.

The Boston and Maine Railroad Extension Company, which has since become merged in the Boston and Maine Railroad, the present respondents, was incorporated by an act passed on the 16th of March, 1844, (*St.* 1844, *c.* 172,) with authority to construct and complete a railroad, not definitely located by the act, but with liberty to locate the same within certain limits so described, that it might pass over a part of the flats belonging to the land owned by the commonwealth, on which the state prison stands, or it might be located within the same 'imits, without crossing any of the land or flats constituting the state prison lot. The route commenced at a point on the Boston and Maine Railroad in Wilmington, fifteen or sixteen miles from Boston, and terminated within the city of Boston, crossing Mystic and Charles Rivers. The track of this road must necessarily cross the track of the Charlestown Branch · Railroad Company ; and it was provided in the act, that it should not cross that road at any point east of the state prison, without the assent of the directors of the Charlestown Branch Railroad Company. The Boston and Maine Railroad Extension Company, in addition to the above and a few other special provisions, not material to this inquiry, are invested with all the .powers and privileges, and made subject to al. the duties, restrictions, and liabilities, set forth in the forty-fourth chapter of the revised statutes, and in that part of the thirty-ninth chapter, and the statutes subsequently passed, which relate to railroads.

It is now insisted, on the part of the respondents, that this being the grant of a franchise, with power to take land, it is of necessity a grant for public use, for otherwise it would not justify the taking of private property; that if it is for the public use, the presumption of law is, that the commonwealth intended to grant whatever was necessary to make it useful; and if the grant was in terms to lay out the road over any portion of the soil of the commonwealth, or of a power to locate it in such manner, that it would pass over any

soil of the commonwealth, and it has been so located, it was in either case a grant of such land to a public use, for which the commonwealth can claim no compensation.

In considering this question, our first remark is, that the inquiry is limited to lands of the commonwealth acquired by purchase, not for a highway or other public easement, but to be held by the commonwealth, as a body politic, for a particular purpose, and to be used as land, as for a public prison; that it is also limited to upland, and such flats, as the colony ordinance annexes to the soil of private owners of land bordering on creeks or coves in which the tide ebbs and flows; and that this is wholly independent of the question as to the right and power of the commonwealth, in its sovereign capacity, over soil under navigable waters, or over flats beyond one hundred rods from any upland. The inquiry relates solely to the property of the commonwealth which it holds in fee, in its capacity as a body politic.

It appears to us, that the question is purely a question of intention, to be derived from the act of the commonwealth, as applied to the subject matter, and expounded in conformity with the established rules of construction. It is very clear, that the commonwealth, by an act of legislation, in express terms, may grant its lands, or any qualified interest or easement in land. It is equally clear, that the commonwealth may grant a franchise, including a power to lay out a way over its lands, upon such terms as the legislature may prescribe, among which may be a condition, that the grantees shall pay a reasonable compensation for any land of the commonwealth which may be taken; and the corporation thus created, by accepting the act, will bind itself to a performance of the condition.

Upon a careful examination of the act of incorporation, in the present case, the court are of opinion, that it was not the intention of the legislature to grant the land of the commonwealth, or an easement therein, to this corporation, without compensation. The act is in the common form, and the substance of the franchise is: to be a corporation; to take land; and to take toll. We think, that if the legislature had in-

tended to aid the enterprise by an appropriation of money, land, or other means, — such aid being unusual, — the purpose to do so would be in the same way expressed. Instead of this, the grant of the franchise is made to the corporation, subject to the duties and liabilities set forth in the thirty-ninth chapter of the revised statutes. One of the liabilities expressed in that chapter, § 56, is this: "Every railroad corporation shall be liable to pay all damages, that shall be occasioned by laying out and making and maintaining their road, or by taking any land or materials;" and the section then provides modes in which such damages shall be estimated, assessed and paid. This is very explicit: "all damages occasioned by laying out, &c."

It was argued, that this was intended to apply to the case of private persons, whose property should be taken under the authority of the state, in virtue of its sovereign power, and in the exercise of its right of eminent domain. No doubt this would be its operation, in a vast majority of cases; but the language is broad enough to extend to the land of the commonwealth, and therefore as a general rule, intending it to include all land taken; and it would be competent for the legislature, under special circumstances, and when it is intended to aid such an enterprise, by the grant of public land, to express it in terms in the act, leaving the general rule to operate when no such purpose is intended by the government.

An argument in support of the view, that the section alluded to was only intended to apply to the case of private persons, was drawn from the language of the highway act, Rev. Sts. *c.* 24, § 11, which provides an indemnity for damages sustained by any *persons* in their property.

To this several answers may be given: In the first place, the laying out of a public highway is the obtaining of a pure public easement, where there is no reimbursement by tolls, or other benefits; whereas a railroad, like a turnpike, is obtained upon another principle; and although the public accommodation is the ultimate object, the whole expense in the first instance is advanced by individuals, as a joint stock company,

to be afterwards reimbursed by a toll. If, therefore, the right to damages, on laying out an open, public highway, were limited to private persons, it would not necessarily follow, that the same reason should extend to railroads.

But, secondly, it is not clear that the indemnity is limited to persons; for by the Rev. Sts. *c.* 2, § 6, clause 13, the word "person" may extend and be applied to bodies politic and corporate, as well as to individuals. And the preamble of the constitution sets forth that instrument, as the mode of forming the inhabitants of the commonwealth into a body politic. But without placing much reliance upon considerations of so technical a character, we think that where general rights are declared, and remedies given, they include the commonwealth, though not named. If a new mode were provided by law, for securing or recovering a debt, for getting possession of real estate, or the like, the commonwealth would have the benefit of such new mode, when applicable, though expressed in general terms. But, if there be any difference in the terms used between the case of common highways, and the case of railroads, then it is to be presumed, that such a difference was intended by the legislature ; and the larger terms, in respect to railroads, "all damages occasioned," &c., must be held to apply to the present case.

But it was urged, that it could not be presumed, that the legislature intended to exact money in any form for property taken for a public easement; because the public, whose property it is, would obtain their equivalent in the enjoyment of the easement. An answer to this has been suggested above ; but perhaps it requires to be somewhat more fully considered. The public accommodation is the ultimate object of the enterprise, and warrants the interposition of the sovereign power of the government to procure it, and to prescribe the necessary means of obtaining it, to the extent of taking individual property, at an appraisement, subject to be revised by a jury. But the government may adopt whatever means they think expedient for obtaining such public accommodation. They may do it by a tax or charge on towns or counties, or

by direct appropriations from the public treasury, or by grants of land, either of that over which a way is to be built, or of other lands owned by the commonwealth. The latter was a very common expedient, when the state was the owner of large tracts of unsettled land. Or the state may grant the franchise, and authorize individuals to raise a fund, and make all the required outlays, in the first instance, to be reimbursed by tolls or fares to be levied upon the transit of passengers or merchandise.

The latter, it is believed, has been the plan in regard to every railroad, thus far established in this commonwealth. The whole plan and scheme of the enterprise is, that the entire outlay and all the disbursements, including the value of land necessarily taken, shall be advanced in the first instance by the corporation ; and the tolls, fares, and freights to be levied on transportation are to be so adjusted, that the aggregate shall pay all expenses and afford a fair income to the proprietors upon their entire investment. It is to make the travel accommodated pay the whole expense of the accommodation. Why, then, although the use is a public one, shall it be presumed, that the commonwealth intended to give land, in a particular case, any more than it shall be presumed, that they intended to give money from the treasury?

This claim cannot be considered an equitable one by the corporation upon the commonwealth, if they have consented to receive their reimbursement in another form, namely, from tolls, freights and fares ; and the corporation can judge before they embark in the enterprise, whether this source is adequate, and they are under no obligation to undertake it. They have a chance of making large profits; and they run the risk of sustaining loss ; but if a loss occurs, the commonwealth are not liable.

The same general view, we think, is an answer to another argument of the respondents, that the railroad corporation are constituted agents for the public in laying out the road, and that if the land of the commonwealth is taken by them for that purpose, it is taken by their own agents. This is partly

true. but the conclusion drawn from it does not follow. The corporation are agents for the public, and invested with power, within certain limits, to exercise the right of eminent domain; and to fix within certain limits the precise location of the road, and thereby to designate the specific land to be taken; but they are not the agents of the public, invested with authority to bind them by any contract, or to appropriate public land, money or other property to the promotion of the enterprise.

The next material question is, whether the commonwealth is rightly represented in these proceedings, before the sheriff's jury, and whether these proceedings were rightly conducted in this respect, there, and before the court of common pleas, and in this court.

The proceedings now under consideration commenced with the petition of these respondents to the commissioners, praying that a warrant might be granted to the sheriff, to summon a jury to revise the damages assessed against them by the commissioners. It is to be presumed, that the commissioners gave notice of this petition, in some form, to the commonwealth, before ordering a warrant. The warrant then issued, directed to the sheriff, in the usual form, commanding him to summon a jury, to meet, &c., and if they see cause, to consider and estimate the damage done to the commonwealth, by the erection and construction of their railroad over and across the land of the commonwealth. And the sheriff was thereby ordered to give notice of the time and place of meeting for the purposes aforesaid to the petitioners and all others interested. The return of the sheriff states, that he gave seasonable notice to the parties; as the parties were the respondents on the one side, and the commonwealth on the other, it results that the commonwealth were summoned, and it is not objected that they were not duly summoned. When no other special mode of summons is provided by law, notice to the governor, as the chief executive officer, would probably be considered good notice.

It then appears, by a statement accompanying the sheriff's

return, and as a part of it, that at the time appointed for empanelling the jury, Messrs. Bartlett, Dana and Warren appeared in behalf of the commonwealth, and their right to do so being denied by the respondents, proof was offered of a letter addressed by his excellency, the governor, to Samuel D. Parker, esquire, commonwealth's attorney for the county of Suffolk, dated December 24th, 1845 ; and Mr. Parker, being himself present, filed a letter under his hand, addressed to Messrs. Bartlett, Warren and Dana, requesting them, on account of his engagements elsewhere, to appear for the commonwealth and act in his behalf in conducting the cause before the sheriff. The sheriff decided, that the commonwealth was rightly represented, to which decision exception was taken.

Upon this point, two questions arise : first, whether Mr. Parker himself was duly authorized to appear and represent the commonwealth ; and, second, whether he could lawfully substitute and authorize other duly qualified counsellors at law to act in his behalf, in the case of his necessary absence. As to the authenticity of the act, by which this substitution was made, no question can arise, because Mr. Parker appeared in person, to answer to the summons, and by a paper under his hand, addressed to Mr. Bartlett and others, requested them to appear in his behalf; and by presenting this paper to the sheriff, to be put on file, gave him notice of this substitution, with the exigency which occasioned it ; and made an implied request to the sheriff that the counsel substituted might be so received.

I. As to the first inquiry. There was not at that time, nor has there been since,* any attorney-general, or recognized general law officer of the commonwealth. That office was abolished in 1843, by an act to be more particularly examined presently. By the Rev. Sts. *c.* 13, §§ 28, 34, and following sections, the duty of representing the commonwealth was distributed amongst the several prosecuting officers, namely, the

---

* This opinion was delivered before the passing of the act of 1849, *c.* 186, by which the office of attorney general was reëstablished.

attorney-general, the district attorneys, and the commonwealth's attorney for the county of Suffolk. By § 29, the attorney-general was required to appear for the commonwealth in the supreme judicial court, when holden as a full court, in all cases of prosecution for crimes punishable with death ; and by § 30, he was required, when called upon by the governor, or either branch of the legislature, to appear for the commonwealth, in any court or tribunal, in any other causes, criminal or civil, in which the commonwealth might be a party or be interested. By §§ 37, 38, the attorney for Suffolk and the district attorneys are required, within their respective districts, to appear for the commonwealth in the supreme judicial court, the court of common pleas, and the municipal court of the city of Boston, in all cases, criminal or civil, in which the commonwealth might be a party or interested, with other duties not material here to be enumerated.

Such was the state of the law, when the office of attorney-general was abolished by the statute of 1843, *c.* 99. By § 2, the attorney for the county of Suffolk, and the several district attorneys, within their respective districts, were required to appear for the commonwealth, in all prosecutions for crimes punishable with death. This, together with their existing powers, conferred by the revised statutes, constituted a sufficient provision for the appearance of the commonwealth in all cases civil and criminal, before the supreme judicial court, the court of common pleas, and municipal court. By the former law, they were required to perform all the duties in these courts, in their respective districts, which the attorney-general was authorized to perform, and which were not required to be done by him personally. But the attorney-general was, by the same act, required to appear personally before the full court, in all capital cases, and in law arguments, and also when required by the governor or either branch of the legislature, to appear for the commonwealth in any court or tribunal, in any other causes, criminal or civil, in which the commonwealth might be a party or interested. When the office of attorney-general was abolished, by the statute of

1843, *c.* 99, the execution of these powers was provided for by the third section, in the following manner: "The commonwealth's attorney for the county of Suffolk shall also, when required by the governor, or either branch of the legislature, appear in all causes, in which the commonwealth shall be a party, or be interested, and shall, when required, give his opinion upon questions of law submitted to him by the legislature, or the governor and council."

This provision was obviously designed to provide for the exercise of those powers of the abolished office of attorney-general, which were not clearly provided for by the previous laws vesting power in the district attorneys, and the additional power given to those officers and to the attorney for Suffolk, in a previous section (§ 2) of the act.

The words are broad and unlimited; "in all causes" when required by the governor. It is argued, that this language must be taken with some limitation, arising from other provisions giving powers to the district attorneys; otherwise there would be a clashing of authorities.

This may be answered, first, by the obvious suggestion, that the governor is not likely to make such requisition, when the case is already sufficiently provided for by the local officer; unless in some extraordinary emergency, when the local officer is disqualified by interest, sickness, or otherwise.

But, secondly, this is a ministerial authority, and should it be vested in two different persons, it is but a concurrent authority, like that given by the revised statutes to the attorney-general, and the district attorneys, to be exercised by eithe. in the absence of the other, or by both together if present.

And, thirdly, in the present case, we are of opinion, that there was no such conflict, and that the district attorney for the district including the county of Middlesex had no authority *ex officio* to appear and represent the commonwealth. The district attorneys were required *ex officio*, within their respective districts, to appear for the commonwealth in the supreme judicial court, court of common pleas, and municipal court, in all cases civil or criminal. This case, when before

the commissioners, or the sheriff's jury, was not within this description; and, of course, the authority to conduct it was not with the district attorney. But the attorney-general, when required by the governor, was required to appear before any court or tribunal; a description including a case like the present. This last power was a power vested, upon a like requisition, in the attorney for the county of Suffolk, and was not extended to the district attorneys.

The court are therefore of opinion, that upon the requisition of his excellency, the governor, Samuel D. Parker, esquire, had authority to appear for the commonwealth. The letter of the governor, dated December 24th, 1845, was an authority to institute proceedings, and such authority extends to the prosecution of such proceedings to their termination; and when the object is to recover damages for land taken, it not only includes the proceedings in the first instance before commissioners, but the subsequent proceedings before the sheriff's jury, to obtain a verdict, and before the court of common pleas to obtain an affirmance of such verdict. The intimation to the attorney, Mr. Parker, to take care that the commonwealth is saved harmless, is a caution and direction for his government, but not a condition precedent to the vesting of the authority.

II. Supposing the commonwealth rightly before the sheriff, by their attorney, Mr. Parker, we can have no doubt, that with the permission of the court, — in this case, of the sheriff, — he had a right to avail himself of the aid and assistance of other counsel, in the conduct of the cause; many cases must occur in the course of practice, when such a public officer, charged with numerous and exacting duties, may require the aid of other suitable counsel, although the responsibility, for the proper management and conduct of the cause, devolves on him. We are therefore of opinion, that the decision of the sheriff, in ruling that Messrs. Bartlett, Warren and Dana were duly authorized to appear as counsel for the commonwealth, was right.

It should have been stated, in its proper place, that, in

opposition to the appearance for the commonwealth, the respondents insisted, that the present was not a case in which the commonwealth were a party, or interested, because from other facts of the case, it appeared, that the suit was prosecuted at the instance and for the benefit of the Charlestown Branch Railroad Company. But we think the commonwealth were both a party and even interested. They were a party, because they claimed damages in their own legal right, and when damages were allowed them by the commissioners, they were summoned in, on the application of the respondents, to answer to their appeal for a jury. And although they might claim to recover for the use and benefit of another party, the claim of such other party was like that of the assignee of a chose in action, who could not claim in his own name. But the commonwealth are also interested. The amount, when recovered, is, by the terms of the assignment, to be placed in the treasury of the commonwealth, and it is only upon compliance with certain terms, that it is to be paid out to the Charlestown Branch Railroad Company. This therefore is no answer to the claim of the commonwealth to appear and prosecute for their damages.

Several other questions were raised on the report, which we shall pass over summarily.

1. It was objected that the contract between the commonwealth and the Charlestown Branch Railroad Company was an illegal contract, and gave no right or title to that company.

We cannot perceive upon what ground the respondents can raise that question. In this respect, the rights of the commonwealth and of that company constitute but one claim against the respondents, and, if as against them the commonwealth have a right to recover the claim, it seems immaterial to them, whether these damages rest in the commonwealth's treasury, for their own benefit, or go to the Charlestown Branch Railroad Company, in satisfaction of services done by them on a contract between them and the commonwealth.

2. Another ground of exception was, that Fosdick was

held competent to sit as a juror, although interested in the event of a succeeding case. We think that was no sufficient ground for the exclusion of the juror.

3. The admission of the testimony of Felton. The most that can be made of this exception is, that the testimony was immaterial. But we are of opinion, that it was competent. It bore upon the question of localities, and might have a just influence in giving effect to the construction of the alleged grant; especially if there were any latent ambiguities, in the terms of the grant, which became apparent upon applying it to the local objects mentioned in the description.

4. Raising the flats under and around the respondents' bridge. The respondents requested the sheriff to instruct the jury, that as this was not done at their request, the commonwealth could not recover the cost of such filling up. The sheriff declined so to instruct, but gave the instruction, that the petitioners were entitled to such sum, for raising the flats, under and around the respondents' bridge, and within the location of the railroad, as the jury should find necessarily incurred in order to enable the commonwealth to enjoy their other lands, if the jury should believe that such necessity was created by reason of the location and construction of the railroad.

This instruction was correct. The claim was not to be allowed, because it conferred an incidental benefit on the respondents by filling up a tract of flats for their bridge, which the respondents might otherwise have themselves been at the expense of filling; but because it was a convenient and economical mode, on the part of the commonwealth, of securing their own flats for use and enjoyment, instead of building two long sea walls; the expense thus incurred being like that of fencing and the repairing of other damage incidental to the taking of land. If this filling up saved the necessity of sea walls, along the line of the railroad, which would otherwise have been necessary, it was no objection to adopting such expedient, if not more expensive than sea walls, that it conferred a benefit on the respondents. Some mode of securing

5 *

their own grounds was a necessary incidental expense, and as such allowable.

5. The testimony of George A. Parker. The rule, laid down by the sheriff, was accurately and carefully stated.

6. It was objected, that the Charlestown Branch Railroad Company could recover no damage under the contract of October 15th, 1844. The sheriff's instructions, upon this point, were correct.

7. Exception was taken, that the evidence offered by the petitioners, in relation to their title to the flats, was not sufficient to maintain their title thereto, because they had not shown that the flats in question were appurtenant to the upland described in M'Neil's deed to the commonwealth, and the respondents requested the sheriff so to instruct the jury, which he declined.

The deed of M'Neil, conveying the land and flats appurtenant, was in evidence ; and the possession of the upland, by the commonwealth, was proved by Austin and Wadsworth, and also the localities and admeasurements, upon this point of title to the flats.

But the true answer to this objection is, that the question was purely one of fact for the jury, upon the evidence ; that. the sheriff could not be called upon to instruct the jury in regard to the weight, effect, or sufficiency of the evidence ; and that no question of law arises thereon, which is open on this appeal.

---

When the above opinion had been pronounced, the petitioners moved for an allowance of interest on the amount of the damages awarded by the jury, and also for costs.

*S. Bartlett*, for the petitioners.

*B. R. Curtis*, for the respondents.

The opinion of the court was subsequently delivered.

SHAW, C. J. An opinion having been expressed in favor of the petitioners, affirming a judgment of the court of common pleas. accepting a verdict, in their behalf, for damages

for taking land, an application is now made by them for an allowance of costs, and also for interest on the verdict.

1. As to costs : the claim, as we understand it, is for the costs and expenses of the jury, and for the sheriff's costs, incurred after the estimate of damages made by the commissioners, together with the costs of the court of common pleas, to which court the verdict was returned. We understand the facts to be, that it was conceded on the part of the petitioners, that the amount of the damages awarded by the county commissioners was somewhat larger than the amount awarded by the verdict of the jury ; that is, that the verdict of the jury reduced the amount of the commissioners' estimate to some extent.

The provision of the Rev. Sts. *c.* 39, § 62, which is the only direct provision on the subject in the railroad act, does not seem to reach the case. After having provided, in § 57, that either party, dissatisfied with the estimate of the commissioners, may apply to the commissioners to order a jury, the statute proceeds in this section to direct, that the railroad company may tender the amount of the damage as estimated, and if the owner shall refuse to accept it, with costs to be taxed to that time, and shall apply for a jury, &c., he shall pay all costs, unless he shall increase the damages ; and if the corporation shall apply, &c., of course, not having made a tender, because they are dissatisfied, and the ground of their complaint is, that the damages are too high, and if, on a final hearing, they shall not obtain a reduction of the damages, they shall pay all costs.

The provisions in the statute respecting common highways throw no light on the subject, because the course of proceeding is altogether different. There the petitioners for a road, in the outset, enter into an obligation to pay all costs, &c. Besides, the application for a jury can only be made by the land owner, and cannot be made by the county. *Baker* v. *Thayer*, 3 Met. 312. Nor does the question depend upon the general statute, respecting the prevailing party, in actions at law. *Hampshire & Hampden Canal Co.* v. *Ashley*, 15 Pick. 496.

We are then brought back to the provisions of *c.* 39, § 62. Up to the time of the completion of the commissioners' estimate, the land owner, by implication, is entitled to his costs if he accepts such estimate ; because it is provided that the amount of the estimated damages may be tendered, and if the land owner declines accepting such amount with costs, he proceeds at the peril of paying costs, if he does not increase the amount.

The statute then provides, that if the railroad company apply for a jury, and fail to reduce the damages, they shall pay all the costs. This is a clear implication, that if they do succeed in reducing the damages, they are not to pay costs. But this is the extent of such implication, and it does not follow, in such case, that the railroad company are to recover costs against the petitioners, and there is no express provision to that effect. We are, therefore, of opinion, that in a case like the present, neither of the parties is liable to the other for the costs of proceeding before the sheriff and jury ; not the respondents, because they have succeeded in reducing the damages, and, therefore, by the necessary implication of the statute, are exempt from costs ; nor the petitioners, because the statute charges them with costs, where they have refused a tender of the damages estimated by the commissioners, and have failed to increase the damages by a verdict of the jury. This rule, however, does not apply to the costs of the appeal from the judgment of the court of common pleas, accepting the verdict of the jury, to this court. That appeal was taken by the railroad company, and the judgment of the court of common pleas has been affirmed ; and therefore we think that the petitioners are entitled to their taxable costs of the appeal, to wit, the travel, attendance, copies, entry in this court, and other taxable costs of the appeal. These costs are to be taxed here, and included in the certificate to the commissioners.

2. In making up the judgment in this court, we are of opinion, that interest ought to be allowed to the present time, from the time that the verdict was returned to the court of

common pleas. The amount then became liquidated, and in the nature of a judgment. The case of writs of error is very analogous. Rev. Sts. *c.* 112, § 14. The statute gives interest at six per cent, and allows a greater rate in certain cases. Whenever a case is detained in court for advisement, it has been the practice to allow interest on the verdict. Interest is allowed in debt on judgment as damages. And by a recent statute, interest is taxable on executions.

But we think this point is settled by Rev. Sts. *c.* 82, §§ 15 and 10. In the case of an appeal, if the defendant fails to enter his appeal, the court may, on complaint, affirm the former judgment, or render such judgment as law and justice shall require. We believe it has been the practice, under this authority, to allow interest as an incident. So by § 14, the court may render a similar judgment, on complaint, when an exceptant fails to enter his exceptions. Then comes § 15, which, we think, applies to both cases, and vests the court with the fullest authority to make such order as the court of common pleas should have done and render such judgment, &c.

We consider it the plain dictate of justice, when money is due on a judgment, or on a verdict in the nature of a judgment, and payment is prevented by the necessary time taken for reëxamining the case, if it result in confirming the former judgment, and showing that the party was then entitled to his money, that interest should be allowed as a just compensation for the delay.

3. In regard to the mode of executing the judgment, the authorities not having been collated, we were inclined to suppose, that an execution or warrant of distress from this court, under its general authority to award all process necessary to carry its judgment into effect, would be the proper mode.

But we think it is expressly provided for, by a recent statute, that of 1847, *c.* 259, § 3, which directs that the mode shall be by a warrant of distress, to be issued by the county commissioners. When, therefore, the amount of damages is

liquidated by computing and adding the interest, and the costs are taxed, a certificate will be awarded to the county commissioners, directing them to issue a warrant of distress for the amount.